O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DWIGHT RAY THOMAS JR., | ) | Case No. CV 13-1977-SP |
| Petitioner, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| v. | ) | **ORDER** |
| | ) | |
| KELLY HARRINGTON, Director, | ) | |
| Respondent. | ) | |
| | ) | |

## I.

## INTRODUCTION

On March 19, 2013, petitioner Dwight Ray Thomas Jr. filed a Petition for Writ of Habeas Corpus by a Person in State Custody ("Petition").[1]  Petitioner

---

[1]   Kelly Harrington, Director of California Department of Corrections and Rehabilitation's Division of Adult Institutions, is substituted as respondent in place of the People of the State of California, which petitioner named as respondent in the Petition. *See* Fed. R. Civ. P. 25(d).  Petitioner is in the actual custody of the Sheriff of Santa Barbara County, but is serving his sentence in county jail pursuant to California's Realignment Act.  Answer at 13.  As such, petitioner is in the constructive custody of the California Department of Corrections and Rehabilitation.

1

challenges his April 15, 2011 convictions in the Santa Barbara County Superior Court for first degree residential burglary and receipt of stolen property.

Although presented as four different grounds, the Petition in fact raises one distinct ground for habeas relief: the trial court erroneously denied the defense motion for mistrial after a prosecution witness improperly disclosed the existence of petitioner's prison record to the jury. For the reasons discussed below, petitioner's claim does not merit habeas relief. The Petition will therefore be denied.

## II.

## STATEMENT OF FACTS[2]

At 9:15 on a November morning, John Villa took his son to a motel to visit a prostitute, Leslie Munoz. While he was away, someone smashed the sliding doors of his mobile home and took guns, cash, and a Vizio 32-inch flatscreen television. Between 9:30 a.m. and 10:00 a.m., a witness saw two black men speed away from Villa's home in a dark four-door Sedan.

Munoz had been to Villa's home before. She was close friends with petitioner. Her motel room was registered in petitioner's name. She took a photo of petitioner in her motel room at 8:19 a.m., just before Villa's son came to visit her. At 10:12 a.m., Munoz sent a text message to petitioner that said, "He going from here now, K."

Villa and his son returned home at about 10:12 a.m. Villa called the Sheriff's department. Deputy Jonathan Fleming arrived sometime around 10:30 a.m. At about 11:00 a.m., Villa drove back to Munoz's motel room. He saw a

---

[2]   The facts set forth are drawn largely verbatim from the California Court of Appeal's decision on direct appeal. Lodgment 5 at 2-7. Such statement of facts is presumed correct. 28 U.S.C. § 2254(e)(1); *Vasquez v. Kirkland*, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

black Saturn parked in front and wrote down the license plate number.  When Villa knocked on the motel room door, petitioner answered.  Villa told petitioner and Munoz that he had been robbed and he would be back with the sheriff.

The Saturn was registered to the mother of petitioner's children, Sandra Castillo.  On the afternoon of the burglary, deputy sheriffs searched the home that they shared.  The deputies found a Vizio 32-inch flatscreen television on the floor between the bed and the wall.  It had blood on it and it was unplugged.  Villa later identified the television.

Castillo told a deputy sheriff that a friend gave her the television two or three days earlier.  She said petitioner had been home with her all morning, from the time he took their daughter to school at about 6:00 a.m. until 1:15 p.m., when she and petitioner went to a thrift store and then to Munoz's "house."  Deputies later discovered that Castillo had sent a text message to petitioner at 11:07 a.m. with a photograph of the television.

Detective Fleming interviewed petitioner the next day.  He said petitioner and Munoz were friends and he met her when he got out of the "penitentiary." Petitioner said he had not been to Munoz's motel on the day of the burglary, except to drive by it in the afternoon.  He said he had been home all morning after he took his daughter to school until about 12:30 p.m.  He said he "never" went anywhere else that day.

Petitioner said that two Hispanic men brought a television to his house around noon so he could sell it.  He could not name them.  He told Deputy Fleming, "[A]t the time I know it was stolen."  He then said, "At the time I didn't know it was stolen . . . [,] but . . . I know it has something faulty to do with it."

Petitioner told Deputy Fleming, "I know what happened now.  And I know how-how-how serious it really is.  It was some-some guns involved . . . ."  Deputy Fleming had not mentioned guns.  According to Deputy Fleming's testimony,

3

petitioner said several times that he could get the guns back if they gave him 48 hours.  According to the interview transcript, petitioner said, "I can get you every single one of those (unintelligible) bad men . . . ," and then Fleming and petitioner spoke over and interrupted each other.

Deputy Fleming photographed messages from petitioner's cell phone.  On the day of the burglary, petitioner and Munoz exchanged messages starting at about 4:00 a.m.  At about 6:00 a.m., petitioner exchanged messages with "Sonny." Petitioner wrote to Sonny, "Handle your biz.  I just got off the phone with [Munoz]. She's going to make that call around 7:15 . . . 7:30.  Handle it Little Bro.  Time to go to work."  At 6:20 a.m., Sonny wrote, "The old lady is tripping so I'm not going to make it, Bro. . . . She did not have to work today."  At 7:01 a.m., petitioner wrote to Munoz, "Call . . . back ASAP."  At about noon, petitioner wrote to Sonny, "I got them things, though, all long."  The stolen guns were all long barreled.

Munoz and petitioner were arrested and charged with residential burglary. Petitioner sent Munoz a letter in jail.  He wrote, "let's just get the facts straight.  I came down to – I came down the morning to take you to your storage, kicked it for a minute and took my ass back home.  The only other time that you saw me was when I came back to the room to ask you where Rocky got the T.V. from." Petitioner supplied explanations for the text messages.  He wrote Munoz that the "10:12" text message ("He going from here now, K") "was the manager . . . You know, he's always coming around and always to see if you was doing – if you was gonna pay for another night . . . ."  Petitioner wrote that the "6:12" message to Sonny ("Handle your biz. . . . Time to go to work") "was [about Munoz] making that phone call to see if me and Little Brother could do some work for one of your folks. . . . You pick who . . .  seeing you know just about everybody in every business, I'm thinking the landscaping/maintenance business."  Petitioner wrote that Munoz should "put a straight 10 on it" when she testified.  He wrote, "I want

4

1  you looking extra pretty, China, as it's going down. . . . They will not break us."

2      Munoz entered into a plea agreement.  Under the terms of the agreement, she
3  pled guilty to residential burglary but would be permitted to withdraw that plea
4  after she cooperated with the prosecution and testified.  She would then receive
5  probation in exchange for pleading guilty to grand theft.

6      At trial, Munoz testified that petitioner planned the burglary.  Her role was to
7  keep Villa's son at the motel room as long as she could, "so that his house could
8  get robbed," and to let petitioner know "when the victim left."  She showed
9  petitioner where Villa's house was.  Petitioner was present when she spoke to
10  Villa's son on the telephone to arrange his visit.  Also present were "Rocky" and
11  "Sonny."  When she hung up, petitioner asked her if that was the person "with the
12  guns."

13      During trial, the jury saw a videotape of Deputy Fleming's interview with
14  petitioner and received the transcript.  By agreement, counsel excised the reference
15  to "the penitentiary."  The prosecutor did not admonish Deputy Fleming to avoid
16  reference to "the penitentiary."  Defense counsel did not move to exclude reference
17  to the "penitentiary" or otherwise move to exclude evidence of petitioner's prior
18  criminality.

19      During the redirect examination of Deputy Fleming, the prosecutor asked
20  him about his interview with petitioner.  She said, "Did you ask him how he – if he
21  knew Leslie Munoz?"  Deputy Fleming answered, "He said that he had known her
22  since around 2002, and that he had met her when he had gotten out of the
23  penitentiary."  Defense counsel objected.

24      The court excused the jury and defense counsel moved for a mistrial.  The
25  prosecutor said that she did not intend to elicit the statement.  The trial court found
26  this to be true.  It also found that Deputy Fleming's statement was nonresponsive.
27  Deputy Fleming told the court that the prosecutor did not have "any conversation"

28

1  with him before trial "about not mentioning the penitentiary."  The court initially
2  indicated that it was inclined to grant the motion.  But after inviting and reviewing
3  authorities and considering lengthy argument, the court denied the motion on the
4  following morning.  It concluded that the reference was not unduly inflammatory
5  given the nature of the case as a whole.

6      The court struck that portion of Deputy Fleming's response that referred to
7  the penitentiary, and admonished the jury as follows: "We ended the day yesterday
8  so far as you were concerned with a question asked and a nonresponsive answer
9  given by the officer.  That question asked when the defendant indicated he had met
10  Leslie Munoz.  The answer was nonresponsive.  Nothing in the answer was helpful,
11  or will be helpful, to you in trying to decide whether the defendant is guilty or
12  anything.  I have stricken the answer and you are to disregard it.  Again, it has
13  nothing to do with the issues that you have to decide in this case."

14      Petitioner testified that he did not burglarize Villa's home, he had never been
15  near it, and he did not ask anyone to burglarize it for him.  He said he received the
16  television from "Rocky," but he did not know it was stolen.

17      Petitioner testified that he left his house several times on the morning of the
18  burglary.  He said he took his daughter to school at about 6:45 a.m., went home,
19  and then "went back to town," "to [Munoz's] room."  He was with Munoz about 20
20  minutes, "[j]ust long enough to take her to storage, you know, back, smoke a
21  cigarette."  Then he went home.  While he was home, "Rocky" called to ask if
22  petitioner wanted to make some money.  Petitioner said, "Yes."  Rocky came to the
23  house with a television.  Petitioner did not know where it came from and he did not
24  ask.

25      Petitioner testified that after Rocky left, he went back to Munoz's motel.  He
26  was in her room for about two or three minutes when Villa knocked on the door.
27  Villa said his house had been burglarized.  Petitioner went back home again.  Later

28

6

that afternoon, petitioner and Castillo went back downtown together and drove by Munoz's motel but did not stop.

Petitioner explained some of the text messages. He said Munoz must have been referring to the motel manager when she wrote, "He going from here now, K." He did not ask Munoz to tell him when the Villas left her place. He said he sent the message to Sonny about going to work, because Sonny was going "to do some temporary work possibly for [Munoz]. I mean, not for [Munoz], but for one of [Munoz's] client, temporary work whatever." He said Castillo had sent him a photograph of the television so he "could sell the T.V. to people."

Petitioner acknowledged his letter to Munoz. He said he was not trying to make her testify in any particular way. The prosecutor did not confront petitioner with his criminal history.

Castillo testified that "a Mexican fellow" brought a television into their bedroom at about 9:30 or 10:00 on the morning of the burglary. She asked petitioner if they could keep it, and he said they were "going to make some money off it." Petitioner left at about 11:00 a.m. to take Munoz to a storage unit. Petitioner called and asked her to describe the television. She "texted" him a photograph of it. Castillo acknowledged her felony criminal record.

The jury deliberated for one day and asked several questions before reaching its verdict. In the morning of deliberations, they requested a DVD player, speakers, a transcript of Castillo's testimony, Munoz's testimony, petitioner's "testimony of timeline," and transcripts of "the DVD."

Before returning a verdict in the afternoon, the jurors sent two notes to the court. The first, sent at 2:35 p.m., stated, "We did not all agree on 1 verdict. We read and re-read the instructions." The jury foreman explained that they were divided 10-2 on both counts and could not reach agreement. The court asked the jurors to deliberate for another forty minutes and report back.

7

1    Twenty-five minutes later, the jurors sent another note: "We decided we
2    need direction."  The foreman said that they had a "little bit of a breakthrough"
3    after they sent that note, but they needed more "direction" concerning
4    "circumstantial as opposed to actual physical evidence."  He said, "It seems to be a
5    point that is sticking with one of the jurors," who seems to think "that there's too
6    many areas that gee, he could have done it or he couldn't have done it.  It doesn't
7    look like maybe he was there, maybe he wasn't there.  So, that gives him
8    reasonable doubt."  The court re-instructed the jury on circumstantial and direct
9    evidence and reminded them that, if they could draw two reasonable conclusions
10   from the evidence, they must accept the conclusion pointing to innocence.  The
11   jury returned to the jury room and reached a unanimous guilty verdict on both
12   counts within twenty minutes.

### III.

### PRIOR PROCEEDINGS

15   On April 15, 2011, following a trial, a jury found petitioner guilty of first
16   degree residential burglary (Cal. Penal Code §459) and receipt of stolen property
17   (Cal. Penal Code § 496(a)).  Lodgment 1 (Clerk's Transcript ("CT")) at 137-38,
18   249.  The trial court found true petitioner suffered two prior convictions for which
19   he served prison terms (Cal. Penal Code § 667.5(b)).  Lodgment 8 (Reporter's
20   Transcript ("RT")) at 397-98; CT at 249.  The trial court sentenced petitioner to
21   prison for eight years, consisting of the upper term of six years for the burglary,
22   plus one year for each prior prison term.  CT at 243, 249.  The court imposed and
23   stayed a two-year prison term for receiving stolen property.  *Id*.

24   Petitioner appealed the judgment, raising one argument: the trial court
25   erroneously denied the defense motion for a mistrial after a prosecution witness
26   improperly disclosed petitioner's prison record to the jury.  Lodgment 2.  On
27   November 13, 2012, the California Court of Appeal, in a reasoned decision,

28

1  affirmed the judgment in its entirety.  Lodgment 5.

2      Petitioner then filed a petition for review in the California Supreme Court,

3  raising the same argument.  Lodgment 6.  The California Supreme Court summarily

4  denied the petition for review without comment or citation to authority on January

5  23, 2013.  Lodgment 7.

6                                    **IV.**

7                        **STANDARD OF REVIEW**

8      This case is governed by the Antiterrorism and Effective Death Penalty Act

9  of 1996 ("AEDPA").  AEDPA provides that federal habeas relief "shall not be

10  granted with respect to any claim that was adjudicated on the merits in State court

11  proceedings *unless* the adjudication of the claim –

12      (1) resulted in a decision that was contrary to, or involved an unreasonable

13  application of, clearly established Federal law, as determined by the Supreme Court

14  of the United States; or

15      (2) resulted in a decision that was based on an unreasonable determination of

16  the facts in light of the evidence presented in the State court proceeding."  28

17  U.S.C. § 2254(d)(1)-(2) (emphasis added).

18      In assessing whether a state court "unreasonably applied" Supreme Court

19  law or "unreasonably determined" the facts, the federal court looks to the last

20  reasoned state court decision as the basis for the state court's justification.  *See Ylst*

21  *v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991);

22  *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).  Here, the California

23  Court of Appeal's opinion on November 13, 2012, stands as the last reasoned

24  decision.  *Berghuis v. Thompkins*, 560 U.S. 370, 380, 130 S. Ct. 2250, 176 L. Ed.

25  2d 1098 (2010); *Hines v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

26

27

28

**V.**

**<u>DISCUSSION</u>**

**A.     <u>The Petition Raises One Distinct Ground for Relief</u>**

Petitioner lists four grounds for relief in the Petition: (1) "appeal from [denial of] the defendant's motion for mistrial"; (2) "appeal from the trial"; (3) "appeal from the judgment"; and (4) "appeal from the sentencing." Pet. at 5-6. Petitioner contends these are the same grounds he raised on direct appeal in the state courts. *See* Pet. at 3.  But upon review of the support petitioner offers for each of these grounds, it is apparent that, as on direct appeal, these four grounds all amount to a single asserted ground for relief in Petition: that the trial court's denial of his motion for mistrial after a prosecution witness disclosed his prison record to the jury violated his constitutional rights. *See* Pet. at 5-6.  As such, they will be treated as one claim.

Petitioner also hints at another possible claim in paragraph 9 of the Petition, which addresses exhaustion of habeas claims by asking for the reasons any claims raised in the Petition were not presented to the California Supreme Court. Petitioner wrote the following: "The fact that during jury selection there wasn't one of my 'peers' none of my 'ethnic' background in the audience." Pet. at 7. Petitioner does not list this among the grounds for relief he presents in the Petition, and thus the court does not consider it to be such.

Moreover, even if petitioner had sought to present such a claim in this Petition, it would not have entitled him to habeas relief.  First, any such claim, however it might be construed, was not raised on direct appeal and so is unexhausted.  28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999).

Even if exhausted, to the extent petitioner sought to raise a claim he was denied a jury venire or jury that included at least one member of his race or

10

ethnicity, this claim would be barred by the Supreme Court's non-retroactivity rule in *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989), as this claim would require the court to announce a new rule of constitutional law. Although the Sixth Amendment provides the right to a jury pool drawn from a "fair cross section of the community" (*Taylor v. Louisiana*, 419 U.S. 522, 530, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975)), the Supreme Court has never held that in any single case a criminal defendant is entitled to a jury or jury venire that includes at least one member of his race or ethnicity. Nor does petitioner even suggest any facts to support a claim of a fair cross section violation, such as that persons of his ethnicity were generally underrepresented or systematically excluded from the jury selection process. *See Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979); *Randolph v. California*, 380 F.3d 1133, 1140 (9th Cir. 2004).

To the extent the suggested claim might be construed as one under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), that the prosecutor exercised peremptory challenges based on race, such a claim is baseless. Petitioner offers no evidence, and there is none in the record, that the prosecutor's use of seven peremptory challenges during voir dire was based on race or otherwise improper. *See* CT at 104-07; *Greenway v. Schriro*, 653 F.3d 790, 804 (9th Cir. 2011) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief" (quoting *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)).

As petitioner did not in fact assert the possible claim suggested in paragraph 9 as a ground for habeas relief in the Petition, and as it would not merit habeas relief in any event, the court will not consider it further. Instead, the court turns to the one ground for habeas relief actually asserted in the Petition, based on the denial of petitioner's motion for a mistrial.

**B.**     **Petitioner Is Not Entitled to Habeas Relief on His Claim That the Trial**
         **Court Erroneously Denied His Motion for Mistrial**

Petitioner argues that the trial court erroneously denied his motion for mistrial after a prosecution witness referenced petitioner's prison record, violating his rights to a fair trial and due process.  Pet. at 5-6.  Specifically, petitioner contends that this reference was so inflammatory and prejudicial that no curative admonition could salvage the integrity of the trial.  *Id*.

Federal habeas corpus review is available to correct violations of federal law only.  28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).  Accordingly, a claim based on alleged erroneous admission of evidence under state law is not cognizable on federal habeas review. *Id*. at 67; *Gonzales v. Knowles*, 515 F.3d 1006, 1011 (9th Cir. 2008); *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) (overruled on other grounds by *Solis v. Garcia*, 219 F.3d 922, 929 n.7 (9th Cir. 2000) (*per curiam*)); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) ("We are not a state supreme court of errors; we do not review questions of state evidence law").  Rather, the inquiry regarding such a claim is limited to whether the evidentiary ruling "so fatally infected the proceedings as to render them fundamentally unfair," in violation of due process.  *Jammal*, 926 F.3d at 919 (citing *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986)).

Even limiting review to whether there has been a due process violation, the Ninth Circuit has held that the United States Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  Absent such a ruling from the United States Supreme Court, a federal habeas court cannot find the state court's ruling was an "unreasonable application" of "clearly established federal law" under

1   28 U.S.C. § 2254(d)(1).  *Id*. (citing *Carey v. Musladin*, 549 U.S. 70, 77 (2006)).

2   Under *Holley*, therefore, this court cannot grant habeas relief under § 2254(d)(1) on

3   petitioner's claim that the admission of irrelevant and overly prejudicial evidence

4   violated his right to due process.  *See id*. at 1101 n. 2 (finding that although trial

5   court's admission of irrelevant and prejudicial evidence violated due process under

6   Ninth Circuit precedent, such admission was not contrary to, or an unreasonable

7   application of, "clearly established Federal law" under § 2254(d)(1) and therefore

8   not grounds for granting federal habeas relief).

9          Here, Deputy Fleming testified that when he interviewed petitioner,

10  petitioner told him he met Leslie Munoz "when he had gotten out of the

11  penitentiary."  RT at 219.  Although counsel had agreed to excise petitioner's

12  reference to the penitentiary from his videotaped interview played to the jury, there

13  had been no prior motion or ruling from the court as to whether the reference to the

14  penitentiary would be excluded.  RT at 220-21.  Petitioner's counsel moved for a

15  mistrial, arguing petitioner's prior incarceration was not admissible for any purpose

16  unless petitioner testified, it was highly inflammatory and prejudicial, and could

17  not be corrected with a curative instruction.  RT at 219-20.  After initially

18  indicating it was inclined to deny the motion, and then indicating it was inclined to

19  grant the motion for a mistrial, after reading pertinent caselaw the trial court denied

20  the motion and gave a curative instruction.  RT at 221, 223, 234-37.

21         The Court of Appeal held that any prejudice caused by mention of

22  petitioner's prison record "was curable by admonition because Deputy Fleming's

23  reference to the 'penitentiary' was fleeting and insignificant in the context of

24  overwhelming circumstantial evidence that [petitioner] committed the burglary."

25  Lodgment 5 at 8.  Although "the prosecutor did not warn Fleming not to mention

26  the penitentiary," "the evidence of guilt was overwhelming."  *Id*.

27         [N]o eyewitness saw [petitioner] enter Villa's house, but his own cell

28

13

1    phone messages, his incriminating statements, his letter to Munoz in

2    jail, and the well-corroborated testimony of Munoz supplied

3    overwhelming evidence that [petitioner] organized the burglary.  His

4    inconsistent timelines for the morning of the burglary further

5    discredited his testimony.  This was not an exceptionally close case.

6    *Id*. at 9.  The court concluded that "[t]he passing reference to incarceration here

7    was inadvertent and the trial court did not abuse its discretion when it determined

8    that any prejudice was curable by admonition."  *Id*. at 10.

9         Petitioner has failed to show that the Court of Appeal unreasonably applied

10   federal law or made an unreasonable factual determination in reaching this

11   conclusion.  In denying the motion for a mistrial, the trial court emphasized that the

12   elicitation was unintentional, Detective Fleming's disclosure was nonresponsive,

13   the statement was fleeting, and it was promptly cut off.  RT at 233-35.  The trial

14   court issued an appropriate curative admonition to the jury that did not highlight or

15   belabor the improper statement.  RT at 236-37; *see Richardson v. Marsh*, 481 U.S.

16   200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987) (jurors are presumed to follow

17   instructions given to them by the court).  In fact, the passage of time between the

18   statement (made at the conclusion of one day's testimony) and admonition (given

19   the following morning) may have further diminished the prejudicial impact of the

20   statement and increased the efficacy of the curative admonition.  Finally, the trial

21   court struck the improper statement from the record.  RT at 237.  Petitioner has

22   failed to show that in taking this action and denying the motion for a mistrial the

23   trial court incorrectly applied state law, let alone made an error of constitutional

24   magnitude.  *See U.S. v. Allen*, 425 F.3d 1231, 1236 (9th Cir. 2005) ("isolated

25   reference" to defendant's past incarceration did not warrant mistrial because trial

26   court dissipated any resulting prejudice with a curative instruction); *U.S. v.

27   Yarborough*, 852 F.2d 1522, 1539 (9th Cir. 1988) (same).

28

14

1    Even if the prejudice caused by Detective Fleming's statement was not
2   curable by the trial court's admonition and the court erred by refusing to declare a
3   mistrial, such an error was harmless in light of the overwhelming evidence of
4   petitioner's guilt. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38, 113 S. Ct.
5   1710, 123 L. Ed. 2d 353 (1993); *Allen v. Woodford*, 395 F.3d 979, 992 (9th Cir.
6   2005) ("[T]o the extent that any claim of error . . . might be meritorious, we would
7   reject the error as harmless because the evidence of [petitioner's] guilt is
8   overwhelming.").  The evidence at trial showed that a television matching Villa's
9   was found in petitioner's home hours after the burglary; an eyewitness saw an
10  individual matching petitioner's description driving petitioner's car away from
11  Villa's house at the time of the burglary; and petitioner knew that guns were stolen
12  before police mentioned that fact. RT at 126, 139, 141-42; CT at 268, 270.  Munoz
13  testified she drove petitioner to Villa's home the day before the burglary; she tried
14  to keep the Villas detained for as long as possible to give petitioner time to rob
15  Villa's home; and she texted petitioner after Villa left to warn him of Villa's
16  imminent return.  RT at 168, 180, 182-83.  Munoz's testimony was amply
17  corroborated by text messages between her and petitioner and a photograph of her
18  with petitioner taken on the morning of the burglary.  RT at 168, 170-71, 177, 180-
19  83.  Petitioner sent a letter to Munoz in jail that appeared to instruct her to lie on
20  his behalf.  RT at 185-87.  Moreover, the defense testimony was inconsistent on
21  critical issues.  Castillo told Detective Gamboa that an individual named Gerald
22  Robinson gave her the stolen television, while petitioner testified that Rocky gave
23  him the television.  RT at 322-23, 325-26.  A reasonable jury could convict
24  petitioner for the burglary without the aid of an adverse propensity inference based
25  on petitioner's prior prison record.
26    For these reasons, petitioner has failed to show the state court unreasonably
27  applied federal law or unreasonably determined the facts.  Accordingly, petitioner
28

1   is not entitled to habeas relief.

2                                   **VI.**

3                           **CONCLUSION**

4           IT IS THEREFORE ORDERED that Judgment shall be entered denying the

5   Petition and dismissing this action with prejudice.

6

7

8   DATED:  September 9, 2015          _____

9                                   SHERI PYM
                                    United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28